## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABDUL KARIM KHANU,<br><br>Defendant. | Criminal Action No. 09-087 (CKK) |

## MEMORANDUM OPINION
(October 14, 2009)

Before the Court is Defendant Abdul Khanu's [13] Motion to Exclude $1.9 Million From

Government's Calculations and Admit Closing Agreement into Evidence.  For the reasons

explained below, the Court shall deny on the present record Defendant's motion to exclude the

$1.9 million and hold in abeyance the admissibility of the Closing Agreement until a more

developed record is proffered.

### I. BACKGROUND

Defendant Abdul Karim Khanu is charged with one count of conspiring to defraud the

United States in violation of 18 U.S.C. § 371, three counts of attempted tax evasion in violation

of 26 U.S.C. § 7201, and eighteen counts of aiding and assisting in the preparation of filing false

corporate income and employment tax returns in violation of 26 U.S.C. § 7206(2).  The charges

in the indictment pertain to Defendant's operation of several nightclubs in Washington, D.C. that

were owned wholly or in part by Defendant.  The indictment alleges that from at least November

1997 through December 2003, Defendant owned 24% of a corporation called TAF, Inc. ("TAF"),

which was co-owned by three unindicted co-conspirators. Indictment ¶ 5. TAF operated a

nightclub first known as DC Live and later renovated and reopened as VIP. *Id.* ¶ 6. Defendant

separately formed a corporation called Abdul Productions II, Inc. for the purpose of running

another nightclub called Platinum. *Id.* ¶¶ 7-8. Defendant initially owned 80% of Abdul

Productions II, Inc. and, by 2002, owned 100%. *Id.* ¶ 7. The indictment alleges that Defendant

and the co-owners of TAF conspired to skim cash from TAF's gross receipts so that the

employees of TAF could be paid wages in cash, avoid paying employment taxes on those wages,

assist the employees in avoiding paying income taxes, and concealing their own income and

avoid income taxes. *Id.* ¶¶ 12-13. The indictment further alleges that Defendant skimmed cash

from both TAF and Abdul Productions II, Inc. and prepared false corporate and individual

income tax returns. *Id.* ¶¶ 25-38.

On October 28, 2003, in the course of the government's investigation, agents for the IRS

executed a search warrant at Defendant's residence in Maryland and seized $1.9 million in cash.[1]

Gov't's Mem. Response to Def.'s Mot. to Exclude $1.9 Million from Gov't's Calcs. & Mot. Re:

Closing Agreement ("Gov't's Mem.") at 1. On December 1, 2003, Defendant executed an

affidavit stating that on October 28, 2003, he had a large amount of money stored in his home

safe, and that money was the property of TAF and Abdul Productions II, Inc. ("the

corporations"). *See* Gov't's Mem., Ex. A (Aff. of Abdul Khanu). On February 13, 2004,

Defendant, in his capacity as president of the corporations, entered into a closing agreement

("Closing Agreement") with the IRS. *See* Def.'s Mem., Ex. 1 (Closing Agreement on Final

---

[1] The precise amount seized is actually $1,907,904.00, but the Court shall refer to this amount as "$1.9 million." *See* Def.'s Mem. Law Supp. Mot. Exclude $1.9 Million from Gov't's Calcs. & Admit Closing Agreement into Evid. ("Def.'s Mem.") at 1 n.1.

Determination Covering Specific Matters).

The Closing Agreement states that the $1.9 million seized from Defendant's residence "will be applied as voluntary payments towards the tax liabilities of TAF, Inc. and Abdul Productions II, Inc." *Id.* at 1. The agreement covers "only the following issues: the character, timing, amount and application of the voluntary remittances described herein that are to be applied to the tax liabilities of the two corporate entities." *Id.* The Closing Agreement specifically refers to Defendant's affidavit stating that the $1.9 million is property of the corporations. *Id.* It further states that it "shall not be admissible in any litigation between the parties except for enforcement of the terms and conditions herein." *Id.* The Closing Agreement specifies that it "is final and conclusive except: . . . the matter it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of material fact." *Id.* at 3.

Defendant maintains that, as a matter of business practice, he would sometimes temporarily place cash receipts from corporate events in a safe at his home prior to depositing them in the bank, and the $1.9 million seized was actually corporate money he was planning to deposit. Def.'s Mem. at 2. The Government intends to use the $1.9 million seized as evidence at trial that Defendant skimmed substantial receipts from the nightclubs. Gov't's Mem. at 3-4. Defendant seeks to exclude evidence of the $1.9 million from the Government's case and admit the Closing Agreement as evidence supporting his position that the $1.9 million was not skimmed.

## II. DISCUSSION

A.   **The Closing Agreement Does Not Conclusively Determine Ownership of the $1.9 Million Seized from Defendant's Home**

Defendant contends that the Closing Agreement conclusively establishes that the $1.9

million seized from Defendant's home belonged to the corporations—and that it precludes the Government from using those funds as evidence of skimming from the corporate treasuries. At best, however, the Closing Agreement is evidence that the IRS agreed to accept the seized funds as voluntary payments towards the tax liabilities of the corporations and that Defendant had sworn that the seized funds belonged to the corporations. Although that evidence is consistent with Defendant's position that he was temporarily holding the $1.9 million for safekeeping, it is also consistent with the Government's theory that the $1.9 million was skimmed from the corporations' receipts and—only after the money was seized—applied to the corporations' tax liabilities through an agreement with the IRS.

Defendant correctly notes that the Closing Agreement was entered pursuant to § 7121 of the Internal Revenue Code, which authorizes the Secretary of the Treasury "to enter into an agreement in writing with any person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period." I.R.C. § 7121(a). Such agreements are deemed to be "final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact . . . shall not be reopened as to the matters agreed upon." *Id.* § 7121(b). Section 7121 thus stands in stark contrast to § 7122, which authorizes the Secretary to "compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense." I.R.C. § 7122(a). Agreements entered pursuant to § 7122 explicitly address matters of civil or criminal liability, whereas agreements entered pursuant to § 7121 focus solely on the tax liability of the parties who sign and do not cover criminal cases. *United States v. Mohney*, 949 F.3d 1397, 1408 (6th Cir. 1991). Thus, the Closing Agreement is not binding on the government with respect to criminal prosecutions. Moreover, even if agreements entered under § 7121 could apply to criminal

4

proceedings, the Government's allegations that Defendant unlawfully skimmed the $1.9 million

from the corporations would constitute a showing of "fraud," "malfeasance," or

"misrepresentation of material fact" sufficient to undermine the finality of the Closing

Agreement.

Consistent with the purpose of § 7121, there is nothing in the Closing Agreement that

indicates the parties intended it to extend to the criminal liability of Defendant. First, as

Defendant acknowledges, Def.'s Mem. at 10, he is not a party to the Closing Agreement—the

two corporations are the listed parties. *See also Phillips v. Comm'r*, 178 F.2d 270, 271 (3d Cir.

1950) (holding that corporation's shareholders are strangers to a closing agreement between the

IRS and the corporation). Thus, the Closing Agreement is between the IRS, TAF, and Abdul

Productions II, Inc. Defendant cannot credibly claim that the Closing Agreement—to which he is

not a party and which explicitly limits itself to the issue of corporate tax liability—conclusively

establishes that he did not own the $1.9 million that was seized. The Government is not

foreclosed by the agreement from asserting its position at trial that Defendant skimmed the $1.9

million from the corporations and later falsified an affidavit to cover up his illegal conduct.

Defendant contends that "[i]t is inconceivable that the IRS would have even considered

entering into the Closing Agreement in 2004 if it had thought for a moment that the funds seized

should have been reported by Mr. Khanu on his personal tax returns." Def.'s Mem. at 4-5. The

Court is not persuaded by this argument. The IRS chose to credit Defendant's affidavit in 2004

when it entered the Closing Agreement with the full knowledge that if it later determined that

Defendant was lying, it could reopen the Agreement. The fact that the IRS agreed to apply the

$1.9 million to the tax liabilities of the corporations in 2004 does not mean that it conclusively

determined for all time that those monies belonged to the corporations. If the IRS had had such a

belief, it would have either entered an agreement with Defendant pursuant to I.R.C. § 7122 or

stricken from the Closing Agreement any language regarding "fraud, malfeasance, or

misrepresentation of material fact."

Accordingly, the Court cannot find that the Closing Agreement conclusively determines

the ownership of the $1.9 million seized from Defendant's home.

### B.     The $1.9 Million May Be Included in the Government's Excess Cash Expenditures Analysis

Defendant next challenges the Government's plan to treat the $1.9 million in diverted

corporate funds as a personal expenditure under the cash expenditures method of proof. The

cash expenditures method determines the amount of unreported income by establishing the

amount of the taxpayer's purchases and services which are not attributable to the resources at

hand at the beginning of the year or to non-taxable receipts during the year. *See United States v.*

*Hogan*, 886 F.3d 1497, 1509 (7th Cir. 1989) (citing *Taglianetti v. United States*, 398 F.2d 558,

562 (1st Cir. 1968). "A substantial excess of expenditures over the combination of reported

income, non-taxable receipts, and cash on hand may establish the existence of unreported

income." *United States v. Citron*, 783 F.2d 307, 310 (2d Cir. 1986).

The dispute here is whether Defendant's handling of the $1.9 million may be considered

an "expenditure" in light of the fact that Defendant never actually "spent" the money for his

personal use and claims to have been holding it in trust for the corporation. In other words, the

issue is whether a taxpayer can be obligated to report as income money that is purportedly held

for safekeeping (but is actually skimmed).[2]  Federal courts have previously addressed this

---

[2] Defendant maintains that the $1.9 million cannot be considered an expenditure even if
the Government's facts are accepted. *See* Def.'s Mem. at 6.

question. In *United States v. Toushin*, 899 F.2d 617 (7th Cir. 1990), the court had to determine

whether monies embezzled from a corporation by its sole shareholder are taxable during the year

they are embezzled or taxable during the year they are actually "used" by the taxpayer. *Id.* at

622. The court rejected the view that "[s]ince an owner may take the money for a number of

legitimate reasons—storage or safekeeping, for example . . . the only way to determine when the

taxpayer treats the money as his own is when the taxpayer uses the money for personal benefit."

*Id.* Instead, the court applied the established rule that the taxpayer "exercises ownership over the

money when he has the power to dispose of it." *Id.* at 623 (citing *Comm'r v. Glenshaw Glass

Co.*, 348 U.S. 426, 431 (1955)). The court noted that although "[t]he problem of proof is no

doubt more difficult when this rule must be applied to the transfer of funds from a corporation to

its sole owner," courts and jurors are capable of determining "when an individual has exercised

the sort of dominion and control over funds that would justify, under the general rule, imposing

tax liability upon him." *Id.* Similarly, in *United States v. Curtis*, 782 F.2d 593 (6th Cir. 1986),

the court dealt with a taxpayer who, as the sole shareholder of a corporation, had deposited

corporate funds into a personal account. The court held that "an individual has received income

when he gains complete dominion and control over money or other property, thereby realizing an

economic benefit. It does not matter what the money represents from the standpoint of the

corporation." 782 F.2d at 596.

These cases demonstrate that if Defendant gained complete dominion and control over

the $1.9 million by the time it was seized from his home, it should be considered taxable income

and included in the government's calculations as an "expenditure."[3] As the court noted in

_____

[3] In his reply brief, Defendant takes exception to characterizing this "income" as an
"expenditure" for purposes of the cash expenditures method of proof. *See* Reply at 6. However,

*Toushin*, the jury is capable of deciding whether Defendant's keeping the $1.9 million in his safe

was truly "safekeeping" or conversion for personal use. Defendant's other arguments as to why

the $1.9 million cannot be deemed an expenditure under the cash expenditures method of

proof—that the funds belonged to the corporations and can be conclusively traced to the

corporations' tax returns—have already been addressed in subpart A of the Court's opinion.

### C.   Inclusion of the $1.9 Million in the Government's Tax Loss Calculations Does Not Constitute Entrapment by Estoppel

Defendant claims that the Government's inclusion of the $1.9 million in its calculations

amounts to entrapment by estoppel as a matter of law. The entrapment by estoppel defense

applies where "the defendant establishes by a preponderance of the evidence that (1) a

government official (2) told the defendant that certain criminal conduct was legal, (3) the

defendant actually relied on the government official's statements, (4) and the defendant's reliance

was in good faith and reasonable in light of the identity of the government official, the point of

law represented, and the substance of the official's statement." *United States v. W. Indies*

*Transport, Inc.*, 127 F.3d 299, 313 (3d Cir. 1997). As discussed above, the Closing Agreement

did not specifically address the issue of criminal liability, focusing instead on the civil tax

liability of the corporations run by Defendant. Significantly, the Closing Agreement was not

---

the purpose of the cash expenditure method—as with the "net worth" method and other
recognized methods—is to prove the existence of unreported income through indirect means.
*See Taglianetti*, 398 F.2d at 562-63; *United States v. Mastropieri*, 685 F.2d 776, 778 n.2 (2d Cir.
1982) (discussing several methods of proof and their variations). Under either the net worth or
expenditures method of proof, the $1.9 million may be considered income. This Court does not
believe that the "difficulty" in categorizing the seized funds in a particular manner "justifies the
substitution of a formalistic test for the jury's evaluation of the facts." *Toushin*, 899 F.3d at 623.
Moreover, to the extent that the Government can identify the $1.9 million as a specific item of
income not reported to the IRS, it need not rely on an indirect method of proof. *See United*
*States v. Black*, 843 F.2d 1456, 1461 (D.C. Cir. 1988).

entered pursuant to I.R.C. § 7122, which explicitly authorizes the IRS to compromise a civil or

criminal case, but under § 7121, which limits such agreements to determinations of civil tax

liability.  Far from sanctioning criminal conduct, the Closing Agreement specifically stated that it

would not be final if it was the product of fraud, malfeasance, or misrepresentation of material

fact.  Moreover, the Closing Agreement is premised on Defendant's own affidavit attesting that

the $1.9 million belonged to the corporations, not on any statements by government officials as

to the propriety of Defendant's actions.  At most, the Closing Agreement is an official statement

by the IRS as to the civil tax liability of two corporations.  It cannot be reasonably construed as

an official pronouncement of what conduct is lawful in a criminal context.  Under these

circumstances, including the $1.9 million in the government calculations would not "violate due

process or fundamental fairness," *United States v. George*, 386 F.3d 383, 399 (2d Cir. 2004).

### D.    Admissibility of the Closing Agreement at Trial

The parties ask the Court to determine the admissibility of the Closing Agreement at trial.

Defendant contends that the Closing Agreement is relevant because it tends to show that

Defendant was actually holding the $1.9 million for the corporation and that it was not skimmed.

The Government contends that the Closing Agreement is inadmissible because it is irrelevant,

contains hearsay, and has minimal probative value compared to its potential to confuse and

mislead the jury.

Under Federal Rule of Evidence 401, evidence is relevant if it has *any* tendency to make

the existence of a material fact more probable or less probable than without the evidence.  The

Court finds that the Closing Agreement is relevant because the fact that the IRS applied the $1.9

million to the corporations' civil tax liability may make it more likely that Defendant's intention

was to hold the money for safekeeping.  In some respects, however, the probative value of the

9

Closing Agreement is rather limited. The Closing Agreement was signed *after* the $1.9 million

was seized and was premised on Defendant's affidavit as to the corporate ownership of the funds,

which was also signed after the money was seized. And as explained above, the Closing

Agreement is not final in the event of fraud, malfeasance, or misrepresentation, which the

Government intends to prove at trial. Therefore the Closing Agreement sheds very little light on

Defendant's intentions with respect to the $1.9 million before it was seized by the government.

The Closing Agreement may be more probative of the Defendant's state of mind when he filed

his 2003 personal income tax return in September 2004, which may be relevant to the issue of

whether Defendant willfully filed a false tax return. *See* Indictment ¶ 23(x). However, this

argument is not fully developed in the pleadings.

Under Federal Rule of Evidence 403, relevant evidence may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or considerations of undue delay, waste of time, or needless presentation of

cumulative evidence. The Government contends that the probative value of the Closing

Agreement is negligible compared to its potential to confuse the issues at trial and mislead the

jury in its role as factfinder. *See* Gov't's Mem. at 6. The Court is cognizant of these concerns, as

the Closing Agreement primarily relates to a collateral issue in a civil context and appears to

carry the imprimatur of the federal government. However, at this pretrial stage, the extent of any

confusion cannot be easily measured, so the Court shall reserve its ruling on the applicability of

Rule 403 until trial.

The Government also contends that the Closing Agreement should be excluded because it

contains inadmissible hearsay. Specifically, the Closing Agreement contains a reference to

Defendant's December 2003 affidavit swearing that the $1.9 million is property of TAF and

10

Abdul Productions II, Inc. *See* Def.'s Mem., Ex. 1 at 1 ("Whereas, by affidavit, Abdul Khanu

has sworn that the funds identified above are the property of TAF, Inc. and Abdul Productions II,

Inc.") This reference is hearsay if it is offered to prove that the $1.9 million is the property of the

corporations. *See* Fed. R. Evid. 801(c). Hearsay is inadmissible unless it falls under one of the

applicable exceptions in the Federal Rules of Evidence. Fed. R. Evid. 802. Defendant claims

that because the Closing Agreement was drafted by the government, the reference to the affidavit

qualifies as an admission by a party-opponent under Federal Rule of Evidence 801(d)(2).

However, Rule 801(d)(2) is not applicable to this part of the Closing Agreement because it is not

the Government's own statement being used against it. Rather, it is an out-of-court statement by

Defendant incorporated into the Agreement.[4] Because this hearsay does not fall within any

applicable exception, the statement in the affidavit is inadmissible if offered to prove the truth of

the matter it asserts: that the $1.9 million belongs to the corporations. However, at this pretrial

stage the Court cannot determine for what purposes the Closing Agreement may be offered into

evidence. Therefore, the Court reserves until trial its judgment as to whether the Closing

Agreement is admissible.

### III. CONCLUSION

For the foregoing reasons, the Court shall DENY Defendant's Motion to Exclude the $1.9

million from the Government's calculations, based on the present record. The Court shall defer

judgment as to whether the Closing Agreement is admissible until a later date when the record is

---

[4] The Closing Agreement does not constitute an "adoptive admission" that the $1.9
million belonged to the corporations because, rather than simply stating that fact as given, the
Closing Agreement emphasizes that Defendant "has sworn" that fact to be true by affidavit.
Thus, the underlying truth of Defendant's statement is hearsay to which the IRS did not
"manifest[] an adoption or belief in its truth." *See* Fed. R. Evid. 801(d)(2)(B).

more fully developed.  An appropriate order accompanies this Memorandum Opinion.


Date: October 14, 2009

_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge