# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>ABDUL KARIM KHANU,<br><br>  Defendant. | Criminal Action No. 09-087 (CKK) |

## MEMORANDUM OPINION
(October 13, 2009)

Before the Court is Defendant's [14] Motion to Dismiss Certain Counts in the Indictment on the basis of selective prosecution. Defendant seeks to dismiss Counts One through Five, Seven, and Sixteen through Twenty-Two.[1] For the reasons explained below, the Court shall deny Defendant's Motion.

## I. BACKGROUND

Defendant Abdul Karim Khanu is charged with one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371, three counts of attempted tax evasion in violation of 26 U.S.C. § 7201, and eighteen counts of aiding and assisting in the preparation of filing false corporate income and employment tax returns in violation of 26 U.S.C. § 7206(2). The charges in the indictment pertain to Defendant's operation of several nightclubs in Washington, D.C. that were owned wholly or in part by Defendant. The indictment alleges that from at least November

---

[1] The Court shall not address any issues related to the other counts in the indictment against Defendant.

1997 through December 2003, Defendant owned 24% of a corporation called TAF, Inc. ("TAF"),

which was co-owned by three unindicted co-conspirators.  Indictment ¶ 5.  TAF operated a

nightclub first known as DC Live and later renovated and reopened as VIP.  *Id.* ¶ 6.  Defendant

separately formed a corporation called Abdul Productions II, Inc. for the purpose of running

another nightclub called Platinum.  *Id.* ¶¶ 7-8.  Defendant initially owned 80% of Abdul

Productions II, Inc. and, by 2002, owned 100%.  *Id.* ¶ 7.  The indictment alleges that Defendant

and the co-owners of TAF conspired to skim cash from TAF's gross receipts so that the

employees of TAF could be paid wages in cash, avoid paying employment taxes on those wages,

assist the employees in avoiding paying income taxes, and concealing their own income and

avoid income taxes.  *Id.* ¶¶ 12-13.  The indictment further alleges that Defendant skimmed cash

from both TAF and Abdul Productions II, Inc. and prepared false corporate and individual

income tax returns.  *Id.* ¶¶ 25-38.  The indictment alleges these events took place from on or

about 1998 through 2004.  *Id.* ¶ 10.

## II. LEGAL STANDARD AND DISCUSSION

A selective prosecution claim asks the Court to exercise judicial power over a core

Executive function—the enforcement of criminal laws.  A prosecutor's discretion is, however,

subject to constitutional limits such as the equal protection component of the Fifth Amendment's

Due Process Clause, which prohibits a prosecutor from making decisions based on race, religion,

or other arbitrary classifications.  *United States v. Armstrong*, 517 U.S. 456, 464 (1996).  "In

order to dispel the presumption that a prosecutor has not violated equal protection, a criminal

defendant must present 'clear evidence to the contrary.'" *Armstrong*, 517 U.S. 456, 465 (1996)

(quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).  The defendant

must show both (1) that he was singled out for prosecution from others similarly situated and (2) that his prosecution was motivated by a discriminatory purpose. *United States v. Palfrey*, 499 F. Supp. 2d 34, 39 (D.D.C. 2007). "[T]he standard is a demanding one." *Armstrong*, 517 U.S. at 463. To obtain discovery, the defendant must put forth "some evidence tending to show the existence of the essential elements" of a selective prosecution claim. *Id.* at 468-69; *see also Attorney General v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C. Cir. 1982) (holding that defendant must make a colorable showing as to both selectivity and improper motivation).

## A.   Selectivity

On the issue of selectivity, Defendant claims that he alone, as a practicing Muslim, is being singled out for prosecution among the four co-owners of the nightclubs, the other three of whom are Ethiopian Christians.[2] Defendant argues that these three co-owners of TAF are similarly situated to Defendant because they are alleged in the indictment to be co-conspirators. Specifically, Defendant and the unindicted co-conspirators are all alleged to have conspired to skim cash from TAF's gross receipts to pay employees in cash, conceal their income from tax authorities, fail to report cash wages paid to employees, and file false corporate tax returns. *See* Indictment ¶¶ 11-16. Despite engaging in similar conduct, however, only Defendant was charged with conspiracy (Count One), tax evasion (Counts Two through Four), aiding and assisting in the preparation and filing of false corporate income tax returns for TAF (Counts Five and Seven) and

---

[2] Defendant relies on an affidavit from his cousin to identify the religious beliefs of all four alleged co-conspirators. *See* Def.'s Mem. Law Supp. Mot. Dismiss Certain Counts in the Indictment ("Def.'s Mem."), Ex. 1 (Aff. of Maweyia Deen). The government asserts that it has no basis for knowing the religious faiths of the parties but assumes that Defendant has accurately identified them. *See* Gov't's Opp'n to Def.'s Mot. Dismiss Certain Counts in the Indictment ("Opp'n") at 1 n.1. The Court assumes without deciding that Defendant's characterization of the parties' religious beliefs is accurate.

false quarterly employment tax returns for TAF (Counts Sixteen through Twenty-Two).[3] Because the other three co-owners could have been charged based on these allegations in the indictment,[4] Defendant claims he was singled out for prosecution.

The Government responds that even if the unindicted co-conspirators could have been charged with the same offenses as Defendant based on the indictment, they are not similarly situated to Defendant. *See* Opp'n at 3. The Government notes that the indictment alleges that Defendant, unlike his co-conspirators: operated two separate nightclubs and committed tax crimes at both; was deeply involved in the skimming operation and exercised complete control over nightclub operations; and had a higher profile in the nightclub industry. *See id.* at 3-4. Defendant disputes these claims, noting that the other three co-conspirators had a greater share of ownership in TAF than he did and that one of them also initially owned 20%of Club Platinum, Defendant's other nightclub, and had previously owned two other nightclubs in D.C., making him more prominent in the industry than Defendant. *See* Def.'s Reply to Gov't's Opp'n to Mot. to Dismiss Certain Counts in the Indictment ("Reply") at 2-3. Defendant also disputes that he had full operational control of the nightclub during the relevant time period. *Id.*

"A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) (citing *Armstrong*, 517 U.S. at 469). In considering whether persons are similarly situated for equal protection purposes,

---

[3] The other counts in the indictment pertain to activities in which the three co-conspirators were not involved, i.e., Abdul Productions II, Inc.

[4] The possible exception to this argument is co-conspirator Lemma, who died before Defendant was indicted. *See* Def.'s Mem. at 3 n.1.

a court must examine all relevant factors, including relative culpability, the strength of the case against particular defendants, willingness to cooperate, and the potential impact of a prosecution on related investigations. *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996); *see also United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997) (quoting *Olvis*, 97 F.3d at 744) ("[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."), *cited with approval in Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000).

The Court finds that Defendant has not met his burden to show that his alleged co-conspirators are similarly situated. The Government's contention that it indicted Defendant because he was more involved and took a leadership role in the conspiracy is supported both by the facts alleged in the indictment, which the Court must accept as true when considering a motion to dismiss, *see United States v. Lattimore*, 215 F.2d 847, 851 (D.C. Cir. 1954), and by the written agreement among the co-conspirators, attached to the Government's brief in opposition, showing that Defendant had substantial control over TAF's operations. *See* Opp'n, Ex. A (Agreement).[5] For example, according to the indictment, Defendant (but not his co-conspirators) improperly recorded skimmed cash on TAF's books as personal loans to and from himself rather than corporate receipts, further hiding his skimming from tax authorities and making it more difficult for the IRS to track his tax liabilities. Indictment ¶ 20. Furthermore, the Agreement signed by the four co-owners of TAF in January 2002 naming Defendant as President of TAF explicitly provided Defendant with operational control of the enterprise:

---

[5] Defendant does not dispute the authenticity of this document. *See* Def.'s Reply to Gov't's Opp'n to Mot. Dismiss Certain Counts in the Indictment at 2-3.

> The President shall have the sole and exclusive right to manage the operation of the Club, and is solely responsible for making all decisions pertaining to the day to day operations of the business, free from interference from the other officers and shareholders, and will be solely responsible for all personnel decisions, which will include hiring, training, and terminating all employees of the business.  In other words, it is the intention of the parties that the President shall have total responsibility for the operation of the Club.

Agreement ¶ 4.  Although Defendant correctly notes that the Agreement provided that the other co-owners would have input and oversight over club operations, *see* Reply at 3, the Agreement clearly established Defendant as the manager of the club from January 2002 forward, which is a time period relevant to every count in the indictment.  Moreover, the indictment alleges that Defendant took a leadership role in the skimming scheme from January 2002 forward in which Defendant would keep any skimmed cash in excess of regularly-scheduled stipend payments to his co-conspirators.  Indictment ¶ 23(h).  Defendant is also not similarly situated from his co-conspirators because he opened a second nightclub and is alleged to have committed tax crimes at both clubs, unlike the other co-owners of TAF, who were only involved in one club's operations during the investigatory period.  In addition, Defendant does not dispute that he opened a third nightclub, H20, during the course of the government's investigation.  *See* Opp'n at 4.[6]  This gave him the highest profile in the nightclub industry among the four co-owners.  Accordingly, Defendant has not shown that he was singled out for prosecution among other similarly situated individuals.

**B.    Discriminatory Purpose**

        Even if Defendant could show that he was singled out for prosecution, he must further

---

[6] Defendant maintains that one of the other co-conspirators, Mr. Hidaru, was also involved in two other nightclubs.  *See* Reply at 2.  However, that involvement occurred *prior* to his involvement with TAF.  *Id.*  Thus, when the government was conducting its investigation, Defendant clearly had a higher profile based on the number of clubs he was currently operating.

show that his prosecution was motivated by a discriminatory purpose.  In other words, Defendant must show that the Government is prosecuting him "*because of*" his religion.  *See Wayte v. United States*, 470 U.S. 598, 610 (1985).  Because direct evidence of discrimination is rarely available, a defendant may use statistical disparities and other indirect evidence to show bias or discriminatory motive.  *See Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997).  However, "statistical proof normally must present a 'stark' pattern to be accepted as the sole proof of discriminatory intent under the Constitution."  *McCleskey v. Kemp*, 481 U.S. 279, 293 (1987) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).  Moreover, such statistical evidence must be directly related to the issues facing the decision-maker.  For example, in *McCleskey v. Kemp*, the petitioner challenged his death sentence on the ground that Georgia's death penalty was administered in a racially discriminatory manner, and he proffered statistical evidence showing that the rates at which black and white defendants received the death penalty were significantly different.  *See* 481 U.S. at 286-87.  However, he did not offer any "evidence specific to his own case that would support an inference that racial considerations played a part in his sentence."  *Id.* at 292-93.  The Court held that the broad statistical disparities were too far removed from the specific decisions made at trial to justify an inference of discrimination.  *See id.* at 294-95; *see also Armstrong*, 517 U.S. at 470 (holding that a statistical study assessing discrimination in sentencing generally did not provide evidence of selective prosecution in that particular case).  "To prevail under the Equal Protection Clause, [petitioner] must prove that the decisionmakers in *his* case acted with discriminatory purpose."  481 U.S. at 292.

Defendant's evidence of discriminatory purpose consists of press articles and reports from non-profit groups describing government profiling of Muslims, predominantly by the FBI,

in the wake of the September 11, 2001 terrorist attacks, as well as the fact that Defendant, the only Muslim among his co-conspirators, appears to have been the only one actually investigated for tax crimes.[7] *See* Def.'s Mem. at 4-7.  According to the reports cited by Defendant, the FBI was specifically engaged in religious profiling of Muslims during the time that Defendant's searches occurred and has continued heightened surveillance against Muslims to this day.  *See id.* Defendant asserts that "there was a federal policy in place that had a discriminatory effect motivated by a discriminatory purpose." *Id.* at 6-7.

Even if Defendant's allegations of government profiling of Muslims are accepted as true, however, they do not provide any evidence "that the decisionmakers in *his* case acted with a discriminatory purpose." *See McCleskey*, 481 U.S. at 292.  Defendant's allegations of religious profiling overwhelmingly focus on the FBI and investigations related to terrorism, not tax evasion (except where related to potential terrorist activities). *See* Reply at 3-4.  None of Defendants' "evidence" is targeted at the IRS, which Defendant does not dispute is the agency with exclusive jurisdiction over tax crimes and the investigation here. *See* Opp'n at 6.  Nor are there allegations targeted at prosecutors in either the U.S. Attorney's Office or the Justice Department's Tax Division, who have been primarily responsible for charging Defendant in this case. *See* Reply at 3-4; Opp'n at 7.  Although Defendant claims to have suffered from a government-wide discriminatory focus on Muslims, his supporting evidence is too far removed from the actual prosecuting authorities in this case to allow the Court to infer a discriminatory purpose.  "Because discretion is essential to the criminal process, we would demand

---

[7] Defendant cites the fact that only Defendant's private residence was searched and that the Government admitted in discovery that it did not possess two of the co-conspirators' individual tax returns. *See* Reply at 5 n.3.

8

exceptionally clear proof before we would infer that the discretion has been abused." *McCleskey*, 481 U.S. at 297.

Moreover, as the Government points out, Defendant has not proven that his prosecutors were aware of his religious affiliation. "In order to selectively prosecute on the basis of religion, the government must have knowledge or at least suspect that an individual belongs to a particular sect." *United States v. Napper*, 574 F. Supp. 1521, 1524 (D.D.C. 1983). Defendant contends that "[w]hile the current prosecutors may have not knowledge of Mr. Khanu's religious affiliation, the government submitted no evidence that the investigators and prosecutors involved in the indictment of this case had no such knowledge." Reply at 1 n.1. However, he does not even identify prior investigators who may have had such knowledge. *Id.* It is Defendant's burden to make out his selective prosecution claim, and he has failed to even allege that those prosecuting and investigating him were aware of his religious affiliation. Therefore, Defendant has failed to show some evidence that his prosecution was motivated by a discriminatory purpose.

In addition, because Defendant has not shown some evidence of either prong of his selective prosecution claim, he is also not entitled to discovery on this matter.

### III. CONCLUSION

For the foregoing reasons, the Court shall DENY Defendant's [14] Motion to Dismiss Certain Counts in the Indictment based on the present record. An appropriate order accompanies this Memorandum Opinion.

Date: October 13, 2009

_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge