## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>ABDUL KARIM KHANU,<br><br>　　　Defendant. | Criminal Action No. 09-087 (CKK) |

### MEMORANDUM OPINION
(December 22, 2009)

Before the Court are Defendant's motions for a judgment of acquittal following the close

of the government's evidence and at the close of all of the evidence, on which the Court reserved

its decisions pursuant to Federal Rule of Criminal Procedure 29(b), and Defendant's [80]

Renewed Rule 29 Motion for Judgment of Acquittal, filed after the jury returned the verdict

pursuant to Rule 29(c).[1] Defendant has filed an opening and reply brief in support of his motions

as well as supplemental exhibits, and the Government has filed an opposition. Based on the

evidence in the record, the parties' submissions, and the applicable law, the Court finds that the

Government did present proof at trial beyond a reasonable doubt to sustain a conviction as to

Counts 3 and 4 of the Indictment, the only counts on which the jury returned a verdict of guilty.

The Court shall therefore DENY Defendant's motions for a judgment of acquittal.

---

[1] Defendant's initial Rule 29 motion was made both orally and in writing at the close of the Government's evidence, and Defendant's Rule 29 motion at the close of all the evidence was made orally. Defendant renewed these motions orally after the verdict was returned and agreed to a briefing schedule that has now been completed.

1

# I. BACKGROUND

Defendant Abdul Karim Khanu was indicted by the grand jury with one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371, three counts of attempted tax evasion in violation of 26 U.S.C. § 7201, and eighteen counts of aiding and assisting in the preparation of filing false corporate income and employment tax returns in violation of 26 U.S.C. § 7206(2).   After a jury trial, Defendant was acquitted of the conspiracy charge, the aiding and assisting in the filing of false tax return charges, and one count of tax evasion.   The jury convicted Defendant of two counts of tax evasion relating to Defendant's federal individual income tax returns for the tax years 2002 and 2003.   Because the jury convicted Defendant, the Court recites the facts in the light most favorable to the government.   *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001).

Defendant operated several nightclubs in Washington, D.C. that he owned wholly or in part.   From at least November 1997 through December 2003, Defendant owned 24% of a corporation called TAF, Inc. ("TAF"), which was co-owned by three unindicted co-conspirators. (*See* Indictment ¶ 5.)  TAF operated a nightclub first known as DC Live and later renovated and reopened as VIP.  (*Id.* ¶ 6.)  Defendant separately formed a corporation called Abdul Productions II, Inc. for the purpose of running another nightclub called Platinum.  (*Id.* ¶¶ 7-8.)  Defendant initially owned 80% of Abdul Productions II, Inc. and, by 2002, owned 100% of the company. (*Id.* ¶ 7.)  The Indictment alleged that Defendant and the co-owners of TAF conspired to skim cash from TAF's gross receipts so that the employees of TAF could be paid wages in cash, avoid paying employment taxes on those wages, assist the employees in avoiding paying income taxes, and concealing their own income and avoid income taxes.  (*Id.* ¶¶ 12-13.)  The Indictment further

alleged that Defendant skimmed cash from both TAF and Abdul Productions II, Inc. and prepared false corporate and individual income tax returns. (*Id.* ¶¶ 25-38.)

The evidence at trial demonstrated that Defendant had substantial control and involvement in the operation of his nightclubs.[2] Employees[3] testified that Defendant had the authority to hire and fire security guards, busboys, managers, and other club personnel. The nightclubs generated substantial volumes of cash from items such as cover charges at the door and sales from the nightclubs' many bars. Witnesses testified that proceeds from the door were deposited into safes at the clubs and that Defendant had access to those safes. A bank manager testified that Defendant was the only one who frequently deposited cash on behalf of the corporations that owned the nightclubs. After each night that the clubs were open for business, club employees sent a fax to Defendant's home reporting how much money was made that night. Witnesses also testified that Defendant made numerous expenditures with large sums of cash, paying thousands of dollars in cash for, among other things, swimming pool services, driveway paving, a big screen television, furniture, and a security fence at Defendant's home. (*See* Gov't Ex. 905 (summarizing cash expenditures made by Defendant).)

On or about October 28, 2003, federal agents executed a search warrant at Defendant's

---

[2] Although Defendant did not testify at trial, the Government read into evidence excerpts from testimony Defendant gave to the D.C. Alcoholic Beverage Regulation Administration. (*See* Gov't Ex. 312A.) That testimony showed that Defendant was very knowledgeable about the daily operation of his nightclubs and personally oversaw many aspects of their operation.

[3] Although the issue did not explicitly arise in the presence of the jury, the parties have disputed whether some of the individuals who worked for the nightclubs were employees or independent contractors. Although that issue may remain relevant for civil tax liability, it is irrelevant to the Rule 29 motion, and the Court uses the term "employee" only in the lay sense of the word to mean a person who worked at one of the nightclubs.

home and found approximately $1.9 million in cash in a safe in the mud room of Defendant's house. Federal agents also searched Defendant's nightclubs and found various business records known as "white slips." These white slips, according to testimony by employees of the clubs, were essentially receipts for cash payments. Managers at the clubs testified that the business practice at the clubs was to pay certain employees (such as busboys, security guards, and in some instances, managers) in cash, and the managers would record the amount of cash paid out on a white slip. Those white slips were kept as business records and stored in the clubs' offices. Testimony at trial indicated that these cash payments were not reflected in the nightclubs' payroll system. (11/18/09 A.M. Tr. at 8-10.) After the execution of the search warrant, the business practice at the clubs changed so that employees were paid with payroll checks.

Much of the testimony at trial focused on the nature of the clubs' agreements with various promoters, who would essentially promote the club and bring in patrons each night in exchange for a percentage of the proceeds at the door. According to the club employees who testified, certain club employees, such as security guards, were paid in cash out of the door proceeds. Defendant's theory of the case was that these employees were not actually employees of the club, but in fact were employees of the promoter because they were paid out of the promoter's share of the proceeds. However, no one with personal knowledge of the promoters' agreements testified at trial.

The nightclubs' accountant, Craig White, testified that he was unaware of the white slips and the associated cash payments. (11/18/09 A.M. Tr. at 8-9.) However, he also testified that he advised Defendant that money paid to promoters should not be reported as corporate income for the nightclubs and that employees paid by the promoters are the promoters' responsibility. At Defendant's request, the Court instructed the jury that they may consider good faith reliance on

4

the advice of an accountant to be a defense to the charges in the indictment relating to that advice (which does not include Counts 3 and 4). The Court also instructed the jury that Defendant's good faith belief was a defense to the element of willfulness.

The Government presented the bulk of its case with respect to Counts 3 and 4 through a summary witness, Revenue Agent Fred Lewis. Agent Lewis examined Defendant's use of and access to cash during a period beginning on April 12, 1999 and continuing through calendar year 2003. (11/19/09 A.M. Tr. at 84-85.) Lewis began his analysis with a starting cash on hand figure of just under $700,000, which he derived from a financial statement signed by Defendant on April 12, 1999 indicating that he had $700,000 in cash and bank accounts. (*See* Gov't Ex. 906A.) Testimony in the Defendant's case indicated that this financial statement was provided by Defendant to the lessor of the property that Defendant wanted to use for the Platinum nightclub and was not audited. By subtracting the amount of funds in Defendant's bank accounts on that date, Agent Lewis calculated that Defendant had $698,886.20 in cash on April 12, 1999. (11/19/09 A.M. Tr. at 81.) From that date forward, Lewis added to that figure all potential sources of cash that could be identified, including cash withdrawals and checks written to cash, income tax refunds, and cash wages. (*See* Gov't Ex. 900.) Lewis then compared that figure to Defendant's cash expenditures, including cash deposits made into his bank accounts, the cash seized from Defendant's home in October 2003, and the purchases Defendant made with cash. As a result, Lewis calculated that in 2002, Defendant had total cash expenditures of $609,498.90 but only had $156,403.85 in total sources of cash, suggesting that Defendant had $453,095.05 (the difference) in unreported income. (*See* Gov't Ex. 900; 11/19/09 A.M. Tr. at 107.) Similarly, Lewis calculated that in 2003, Defendant had total cash expenditures of $3,006,154.00 but only had $778,463.93 in total sources of cash, suggesting $2,227,690.07 in unreported income. (*See*

5

Gov't Ex. 900.)

## II. LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides in pertinent part that

"[a]fter the government closes its evidence or after the close of all the evidence, the court on the

defendant's motion must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction." The Court must deny a motion for judgment of acquittal

when, considering the evidence in the light most favorable to the government, "it is sufficient to

permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable

doubt." *Kayode*, 254 F.3d at 212 (quoting *United States v. Harrington*, 108 F.3d 1460, 1464

(D.C. Cir. 1997)). "In ruling on a motion for a judgment of acquittal, 'the trial court must view

the evidence in the light most favorable to the Government giving full play to the right of the jury

to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United*

*States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985) (quoting *United States v. Davis*, 562

F.2d 681, 683 (D.C. Cir. 1977). This stringent standard contemplates that the ultimate decision

of guilt or innocence should be left to the jury, and that it is the province of the jury to credit

certain testimony and reject other testimony.

"When a reasonable mind might fairly have a reasonable doubt of guilt or might fairly

have none, the decision is for the jurors to make." *United States v. Herron*, 567 F.2d 510, 514

(D.C. Cir. 1977). In other words, a judgment of acquittal is warranted "only when there is no

evidence upon which a reasonable mind might find guilt beyond a reasonable doubt." *United*

*States v. Byfield*, 928 F.2d 1163, 1165 (D.C. Cir. 1991) (quoting *United States v. Hernandez*, 780

F.2d 113, 120 (D.C. Cir. 1986)). By contrast, "where the evidence viewed in the light most

favorable to the prosecution is such that 'a reasonable juror *must* have a reasonable doubt as to

the existence of any of the essential elements of the crime,' a motion for judgment of acquittal must be granted." *United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986) (quoting *United States v. Bethea*, 442 F.2d 790, 792 (D.C. Cir. 1971)); *see also United States v. Staten*, 581 F.2d 878, 882 (D.C. Cir. 1978) (the judge must not let the jury "act on what would necessarily be only surmise and conjecture, without evidence").

The evidence "need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990) (quoting *United States v. Harrell*, 737 F.2d 971, 979 (11th Cir. 1984)). Moreover, "[t]here is no requirement of any direct evidence against the defendant; the evidence may be entirely circumstantial." *United States v. Poston*, 902 F.2d 90, 94 n.4 (D.C. Cir. 1990); *Maxwell*, 920 F.2d at 1035 ("No distinction is made between direct and circumstantial evidence in evaluating the sufficiency of evidence supporting a guilty verdict.")

Rule 29(b) states that when a court reserves decision on a motion for judgment of acquittal made at the close of the government's evidence, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Accordingly, in deciding the reserved motion for judgment of acquittal, the Court shall consider only the evidence put on by the government in its case-in-chief. *See United States v. Gray*, 405 F.3d 227, 237 (4th Cir. 2005) ("[A] district court may not reserve ruling on a defendant's motion for judgment of acquittal and then later penalize the defendant by relying upon the defendant's own evidence to deny the motion.") However, because Defendant also renewed his motion for acquittal at the close of all of the evidence and after the jury returned a verdict, the Court shall also separately consider whether, based on the evidence presented by Defendant, the Government has provided sufficient evidence to prove the elements of tax evasion beyond a reasonable doubt. *See United States v.*

*Lopez*, 625 F.2d 889, 897 (9th Cir. 1980) (holding that court should consider all of the evidence, "including that offered for the defense," when Defendant renews motion for judgment of acquittal at the close of all the evidence).

### III. DISCUSSION

The Court shall begin by examining the elements of the crime of tax evasion that the Government was required to prove with sufficient evidence and then discuss the evidence in support of each of those elements.

### A.    Elements of Tax Evasion

Defendant was convicted of tax evasion in violation of 26 U.S.C. § 7201.  To establish a violation of § 7201, the Government must prove the following elements beyond a reasonable doubt: (1) an affirmative act constituting an evasion or attempted evasion of a tax; (2) the existence of a tax deficiency; and (3) willfulness.  *Sansone v. United States*, 380 U.S. 343, 351 (1965); *United States v. Smith*, 267 F.3d 1154, 1165 (D.C. Cir. 2001) (citing *Sansone*).  An affirmative act of evasion is "any conduct, the likely effect of which would be to mislead or conceal."  *Spies v. United States*, 317 U.S. 492, 499 (1943).  The *Spies* Court, "by way of illustration, and not by way of limitation," listed several examples of conduct from which a willful affirmative act can be inferred: "keeping a double set of books, making false entries of alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind."  317 U.S. at 499.  Other affirmative acts of evasion may include filing a false tax return, *see Spies*, 317 U.S. at 499-500, diverting corporate funds for personal use, *see United States v. Mounkes*, 204 F.3d 1024, 1030 (10th Cir. 2000), structuring payments to avoid IRS reporting requirements, *id.*, funneling income through third parties to avoid taxes, *see United*

*States v. Bennett*, 330 Fed. Appx. 686, 687 (9th Cir. 2009), and maintaining a "cash lifestyle," *see United States v. Shorter*, 809 F.2d 54, 57 (D.C. Cir. 1987), *abrogated on other grounds by Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Even a lawful act may serve as an affirmative act of evasion if it done with the intent to evade income tax. *United States v. Valenti*, 121 F.3d 327, 333 (7th Cir. 1997).

To prove the second element of tax evasion, the Government must show that there was an additional tax due and owing for each count for which Defendant was convicted. The Government need not prove the precise amount of unreported income or tax due; it is sufficient if the proof shows that the amounts of income underreported and tax due were substantial. *United States v. Citron*, 783 F.2d 307, 315 (2d Cir. 1986).[4]

To prove willfulness, the Government must show that the law imposed a duty on the defendant, that the defendant knew of that duty, and that he voluntarily and intentionally violated that duty. *Cheek v. United States*, 498 U.S. 192, 201 (1991). Willfulness is determined by a subjective rather than an objective standard: a defendant's good faith belief, even if unreasonable, is a defense to tax evasion. *Id.* at 202. Because direct evidence of a defendant's state of mind is rarely available, willfulness is generally proven indirectly from the defendant's acts or conduct. *See United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999). Circumstantial evidence of willfulness "may consist of, among other things, a failure to report a

---

[4] The Court recognizes that there appears to be a division among the Courts of Appeals as to whether the tax deficiency must be "substantial." *See Boulware v. United States*, 552 U.S. 421, 128 S. Ct. 1168, 1173 n.2 (2008) (noting division without addressing the issue); *United States v. Daniels*, 387 F.3d 636, 640-41 & n.2 (7th Cir. 2004) (citing cases). No court within this Circuit has opined on the subject. The Government has consistently taken the position, more favorable to Defendant, that the tax deficiency must be substantial, and the jury was charged accordingly. Therefore, the Court shall analyze the evidence based on that standard.

substantial amount of income, a consistent pattern of underreporting large amounts of income, the spending of large amounts of cash that cannot be reconciled with the amount of reported income, or any conduct, the likely effect of which would be to mislead or conceal." *United States v. Kim*, 884 F.2d 189, 192 (5th Cir. 1989) (internal citations and quotation marks omitted). The examples cited above by the *Spies* Court also permit an inference of willfulness. *See* 317 U.S. at 499-500.

**B.      Filing False Tax Returns and the Cash Method of Proof**

The Government presented sufficient evidence at trial to prove that Defendant committed tax evasion by filing false tax returns for tax years 2002 and 2003. There is no dispute that Defendant filed individual income tax returns for tax years 2002 and 2003. (*See* Gov't Exs. 105-06.) The filing of a false tax return is an affirmative act of evasion. To prove the falsity of the tax returns and the existence of a tax deficiency, the Government relied on the testimony of Revenue Agent Lewis and his cash method of proof analysis. According to Agent Lewis's analysis of Defendant's uses and sources of cash (based on evidence admitted during the trial), Defendant had substantially more cash expenditures than he had sources of cash during tax years 2002 and 2003. Under the "cash method of proof," the jury may infer from such a discrepancy the existence of unreported income.

The cash method of proof determines the amount of unreported income by establishing the amount of the taxpayer's purchases and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year. *See United States v. Hogan*, 886 F.3d 1497, 1509 (7th Cir. 1989) (citing *Taglianetti v. United States*, 398 F.2d 558, 562 (1st Cir. 1968)). "A substantial excess of expenditures over the combination of reported income, non-taxable receipts, and cash on hand may establish the existence of unreported

10

income." *United States v. Citron*, 783 F.2d 307, 310 (2d Cir. 1986). The Supreme Court

approved of such circumstantial methods of proof in *Holland v. United States*, 348 U.S. 121

(1954). *Holland* was a "net worth" case, in which the government sought to prove that the

defendant had unreported taxable income by showing an increase in the defendant's net worth

unattributable to taxable sources of income.[5] 348 U.S. at 136-37. The Court emphasized that an

important requisite for the proof is evidence supporting the inference that the defendant's

increases are attributable to taxable income. *Id.* at 137. Agent Lewis's testimony, and the

documentary evidence on which it was based, showed the jury that Defendant had, for each of

the tax years in question, more cash going out than he had coming in from reported sources of

income. That income was not reported as such on Defendant's 2002 and 2003 individual income

tax returns, and the Government proved with sufficient evidence to convict that the likely source

of that income was the Defendant's nightclubs. Defendant disputes these points.[6]

1.       *Likely Source of Cash*

Defendant contends that the Government did not present sufficient evidence to suggest

that the likely source of Defendant's excess cash was from a taxable source—in this case, his

nightclub ventures. Defendant argues that because the jury acquitted him of the charges of filing

---

[5] The cash expenditures method is a variation of the net worth method, except that it focuses solely on defendant's use of cash.

[6] Separate and apart from unreported income inferred from the cash method of proof, the Government produced evidence at trial that Defendant received $43,152.48 in 2002 from one of his nightclubs in the form of payments made on a car titled in Defendant's name. (*See* Gov't Ex. 910E (showing payments from corporate account).) Defendant does not specifically address these specific items of income in his Rule 29 motion. The Government produced evidence that Defendant listed the car as a personal liability on a loan application. (*See* Gov't Ex. 252A). This evidence is sufficient to support a finding by the jury that Defendant received these specific items of income from the corporation for his personal benefit without reporting them as personal income.

false corporate income tax returns, the jury must have rejected the Government's theory that Defendant was skimming money from the clubs for his own personal use. *See* Def.'s Mem. at 4. Additionally, Defendant claims that there was no evidence at trial to support the Government's theory that Defendant's unreported income was taken from money dropped into the corporate safe that was to be split with promoters. *See id.*

Defendant's arguments focus too precisely on the Government's theory of the case. In order to establish a likely source of cash, the Government need not precisely articulate the manner in which Defendant obtained the unreported cash, only that it likely came from a taxable source rather than a nontaxable source such as gifts or loans. Once the government introduces evidence of a likely taxable source of income, it need not provide proof to negate every possible nontaxable source. *Holland*, 348 U.S. at 137-38 ("[P]roof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient.") The Government produced evidence at trial sufficient to permit the jury to find that the likely source of Defendant's excess cash was his nightclubs.

The Government's evidence of skimming is circumstantial. But that does not mean it is based purely on "speculation and conjecture," as Defendant argues in his brief. *See* Def.'s Mem. at 5. The evidence showed that Defendant was the person primarily responsible for handling the large sums of cash that were put in the safe at the nightclubs and deposited in the bank. The evidence also indicated that there were cash transactions with promoters that were not reflected in the books and records of the club. And there was evidence to suggest that Defendant's income from the nightclubs was not all being reported to the IRS. For instance, in April 2000, Defendant

listed his annual salary from the nightclubs as "$150,000+" on a loan application.[7]  (Gov't Ex. 250A.)  By contrast, Defendant's year 2000 personal income tax return reported wages of only $67,000 and no separate business income.  (Gov't Ex. 103.)  After the government executed the search warrants in October 2003, Defendant hired the nightclubs' accountant, Craig White, to file his personal income tax returns.  The 2003 tax return for the first time indicates that Defendant earned business income in addition to a paid salary.  (Gov't Ex. 106.)  This change in accounting after the search warrants is sufficient evidence to permit a jury to infer that Defendant had been underreporting his income from the nightclubs prior to getting caught and that this was a likely source of his excess cash.[8]

Defendant cites *United States v. Kleinman*, 167 F. Supp. 870 (E.D.N.Y. 1958) in support of his position that the Government failed to prove a likely source of cash.  But in *Kleinman*, the government had failed to show that the increases in net worth attributed to the defendant were from sources that legally belonged to him, or even that defendant had a lawful occupation or business from which the funds could have derived.  *See* 167 F. Supp. at 873-74.  By contrast, the

---

[7] Defendant contends that "a car loan application does not have to be based solely on income he was receiving from his salary" and that "the evidence is undisputed that Mr. Khanu had millions of dollars in loans from the corporations during this period."  Def.'s Reply at 3.  However, the jury can decide what evidence it will credit, and the Government presented evidence that, if credited, proves that Defendant was receiving substantially more income from the nightclubs than he was reporting on his personal income tax returns.

[8] Defendant's argument that the jury must have disbelieved the Government's skimming theory because it did not convict Defendant of filing false corporate income tax returns is novel but unavailing.  The D.C. Circuit has expressly rejected the notion that a not guilty verdict on one charge precludes consideration of that evidence when assessing the foundation for a guilty verdict on another charge.  *See United States v. Sherod*, 960 F.2d 1075, 1078 (D.C. Cir. 1992).  In any event, the verdicts in this case are not inconsistent.  The jury was instructed that reliance on the advice of an accountant was a defense to Counts 5-8 but not to Counts 2-4.  Accordingly, the not guilty verdict on Counts 5-8 indicates only that the jury may have believed that Defendant relied on his accountant to ensure that the corporate income tax returns were correct.

Government here has shown Defendant had a legitimate business from which he received income and has provided circumstantial evidence to suggest that Defendant was not reporting all of the income he received from the business. The Court finds that the Government presented sufficient evidence for the jury to conclude that Defendant's nightclubs were a likely source of cash.

2.    *Starting Cash on Hand*

Defendant next contends that the Government's cash method of proof is insufficient because it did not establish Defendant's starting cash on hand with reasonable certainty. The evidence the Government presented regarding Defendant's starting cash on hand consisted primarily of an asset statement signed by Defendant indicating that on April 12, 1999, he had a total of $700,000 in cash and in the bank. (*See* Gov't Ex. 906A.) Agent Lewis testified that based on his analysis of Defendant's bank accounts at that time, Defendant only had $1,113.80 in the bank, resulting in $698,886.20 in cash on hand. (*See* Gov't Ex. 906.) That same asset statement also indicated that Defendant had a mortgage and student loan outstanding worth approximately $125,000. (*See* Gov't Ex. 906A.) As the Government points out, having that much debt is somewhat inconsistent with holding hundreds of thousands of dollars in additional cash beyond the $700,000 indicated in the asset sheet, as Defendant argued at trial.

The Government also presented other evidence indicating that it was unlikely that Defendant had additional cash on hand. For instance, Defendant's personal income tax returns for the year 1999 did not reveal a large source of income. (*See* Gov't Exs. 101-02 (showing total income stated on Defendant's 1999 tax return of $40,880).) There was also evidence that Defendant had financed a luxury car purchase in April 2000, borrowing over $120,000 at an interest rate of nearly 10%. (*See* Gov't Ex. 250A (vehicle financing and registration documents).) And there was ample evidence at trial that Defendant routinely took out loans from

14

the corporate accounts of his nightclubs.  Considering all of this evidence, the Government was reasonable in concluding that Defendant did not have any substantial cash reserves beyond the starting figure identified in Defendant's own signed statement.

Defendant also contends that the Government's starting figure is insufficiently precise because an IRS agent admitted at trial that the IRS did not interview any of Defendant's family members to determine if any cash gifts or loans were made to Mr. Khanu.  However, the government is only required to establish the starting cash on hand amount with *reasonable* certainty; it need not exhaustively eliminate every possible nontaxable source of income that Defendant may have had prior to the starting date of the cash method analysis.  *See United States v. Normile*, 587 F.2d 784, 786 (5th Cir. 1979) (holding that the government is not obligated to "follow a trail that might have led nowhere").  Although the government has an obligation to follow all reasonable leads suggested by the Defendant, there is no evidence that Defendant ever proffered his "gifts from family" explanation prior to trial.  In the absence of evidence that Defendant comes from a wealthy family, the Court cannot hold that the government's failure to interrogate Defendant's family members about whether they provided Defendant with substantial nontaxable gifts or loans dooms its cash method of proof on the ground of uncertainty.

The case cited by Defendant, *United States v. Lenamond*, 553 F. Supp. 852 (N.D. Tex. 1982), is not persuasive.  The court in *Lenamond* held that the government's investigation into alternative explanations was insufficient because the defendant's accounting figures were internally inconsistent and should not have simply been accepted without a reasonable investigation into the discrepancies.  *See* 553 F. Supp. at 860-61.  By contrast, Defendant's financial situation did not present any obvious avenues for further investigation by the IRS, and Defendant has not identified any reasonable leads that the IRS overlooked.  Accordingly, the

15

Court finds that the Government established the starting cash on hand figure with reasonable certainty.

   3.   *Willfulness*

Defendant contends that the Government did not produce sufficient evidence that Defendant's conduct was willful. Specifically, Defendant claims that the Government's evidence did not show any of the activities described in *Spies* as sufficient to prove willfulness in a tax case. Def.'s Mem. at 6. However, the record shows otherwise. The *Spies* Court referred to "concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or conceal." 317 U.S. at 499. The jury was presented with evidence that Defendant had $1.9 million in cash stored away in a safe in the mud room of his house. The jury could have inferred from the manner in which the money was stored that Defendant was concealing the money.[9] In addition, the evidence at trial showed that Defendant dealt extensively in cash, and under the totality of the circumstances, the jury could have reasonably inferred that Defendant was dealing in cash to make it more difficult for the IRS to track his income.

In addition, the jury was entitled to consider the recordkeeping practices of the nightclubs in determining whether Defendant's conduct was willful. The evidence showed that nearly all of

------

[9] Defendant argued at trial that this money was actually being held by Defendant on behalf of the nightclubs after a large party associated with the 2003 Howard University homecoming, and Defendant relies in part on testimony from the accountant Craig White that the $1.9 million seized was eventually treated as corporate income by the IRS. However, as the Court explained in its pretrial ruling on this issue, *see* [29] Memo. Op. (Oct. 14, 2009), the ultimate tax treatment of the money by the IRS does not preclude a finding by the jury that the income was personal to Defendant. Construing the facts in the light most favorable to the Government, the jury could have found that the $1.9 million was money taken by Defendant from the nightclubs for his personal use.

the cash payments to employees at the club were tracked with white slips, but they were not

shown to the corporate accountant and were not recorded on the payroll accounting system that

was reported to the IRS for employment tax purposes. This "double set of books" is precisely the

sort of activity the *Spies* Court recognized may give rise to an inference of willfulness.[10] It is also

significant that the evidence seized by the Government during its October 2003 raids on the

nightclubs and Defendant's home did not include any agreements with promoters or accounting

statements indicating how much money had been divided between the nightclubs and the

promoters. This lack of documentation—in the face of detailed cash accounting records for the

rest of the nightclubs' operations—suggests that Defendant was purposely "handling [his] affairs

to avoid making the records usual in transactions of the kind." *Spies*, 317 U.S. at 499.

   The jury was also presented with testimony and documentary evidence revealing that

Defendant (or someone likely connected to Defendant) made a number of large purchases with

cash rather than checks or some other method of payment, including: $25,500 in cash to a

construction company for improvements; $24,000 in cash for construction of a fence; $6000 in

cash for paving a driveway; over $36,000 in cash for landscaping; and $10,770 in cash for a

swimming pool. (*See* Gov't Ex. 905 and supporting exhibits.) Although these uses of cash were

legal, the jury could permissibly have concluded in light of all the evidence that Defendant

engaged in these cash transactions in order to mislead the IRS or conceal his total income. *See,*

*e.g.*, *United States v. Daniel*, 956 F.2d 540, 543 (6th Cir. 1992) (holding that defendant's

---

[10] The Court recognizes that this "double set of books" was kept by the corporations that owned the nightclubs and not by Defendant personally, but Defendant's extensive personal involvement in the nightclubs' operation is substantial enough to permit an inference that Defendant's conduct was willful, particularly when Defendant is alleged to have utilized this double set of books to conceal his skimming from the corporations.

extensive use of cash, in connection with other activities, may show willfulness).

It was reasonable for the jury to conclude that Defendant, a sophisticated business man, had knowledge of his legal duty to pay taxes. The evidence described above is sufficient for the jury to have concluded that Defendant willfully violated that legal duty by filing false individual income tax returns in 2002 and 2003 and therefore that the Government presented proof beyond a reasonable doubt to support the convictions on Counts 3 and 4 of the Indictment.[11]

**D.     Defendant's Case**

Up to this point, the Court has considered only the sufficiency of the evidence presented during the Government's case-in-chief. The Court now examines the evidence presented in the entire case to determine whether any of the evidence in Defendant's case changes the outcome.[12] The Court concludes that based upon the evidence as a whole, the jury could fairly find Defendant guilty beyond a reasonable doubt of the two counts of tax evasion.

Defendant's case consisted primarily of testimony from five witnesses. Defense's first witness was an employee at the car dealership who testified that he sold Defendant a flashy car for use at his nightclubs. This testimony was intended to support the theory that the various cars owned by Defendant were business expenses and that any payments made by the nightclubs for the cars were not personal income to Defendant. Another witness, a private investigator, testified

---

[11] In addition to the filing of false tax returns, the Government contends that Defendant has committed other acts of evasion such as hoarding and spending of cash, providing incomplete or misleading information to his tax preparer, creating false books and records at the nightclubs, and skimming corporate receipts for personal use. Gov't Opp'n at 8-9. It is unnecessary to evaluate each of these alleged acts because the filing of false tax returns is sufficient to support a conviction for tax evasion if there is a tax deficiency and the defendant's conduct was willful. However, the Court is inclined to agree with the Government that the jury could permissibly have concluded that Defendant engaged in these acts in order to mislead or conceal.

[12] The Government did not put on any evidence in rebuttal to Defendant's case.

that the mileage that was put on these cars was consistent with use of the cars for driving back and forth between Defendant's home and the downtown nightclubs. However, the jury was not required to credit this testimony, and the jury could have concluded from the evidence as a whole that Defendant did use these cars for his personal benefit.

Defendant also presented testimony from a witness who was a talent agent who brought some of his clients to Defendant's nightclubs. The witness testified about the large block party event that was held at the nightclubs in October 2003 associated with Howard University's homecoming and estimated that there were about 10,000 people at that party. Documentary evidence produced in Defendant's case suggested that approximately $1 million in revenue was earned during that event. (Def.'s Ex. 69.) This evidence, which the jury may or may not have credited, is consistent with Defendant's theory that the $1.9 million seized from his home was proceeds from this special event. However, the evidence is partial at best, since it does not explain why Defendant would have stored the money in his home safe for nearly two weeks without depositing it in the bank and why there were few records found tracing the $1.9 million to the revenue from the nightclubs. Considering the reasonable inferences in the Government's favor, Defendant's evidence does not compel a finding of reasonable doubt in the mind of a reasonable juror.

Defendant also presented testimony from a former nightclub employee who worked as a security manager. This witness testified about the use of promoters at the nightclubs, the use of flashy cars for business purposes (such as attracting interest from passersby), and an early robbery at the club that sparked an increase in security efforts. The latter evidence supported Defendant's theory that he took money out of the nightclubs and held it in his home for safekeeping. Again, however, the jury was free to credit or discredit this testimony.

19

Finally, Defendant elicited testimony from the real estate broker who arranged the commercial lease for the Platinum nightclub, Peter Mallios. Mr. Mallios testified that the asset sheet signed by Defendant on April 12, 1999 was submitted for the purpose of proving that Defendant had sufficient assets to qualify as a commercial tenant. Mr. Mallios testified that the standard industry practice is not to list more cash on an asset sheet than is necessary to secure the lease, and that the asset sheet was unaudited. Based on this testimony, Defendant argues that the Government's cash method of proof is insufficient because it did not establish Defendant's starting cash on hand with reasonable certainty. However, Defendant's argument overlooks the procedural posture of a Rule 29 motion. The Court must construe the evidence in the light most favorable to the prosecution, and the jury was free to disregard the testimony of Defendant's witness. Based on the evidence presented during the Government's case, the jury was presented with a signed statement from Defendant indicating that he had a total of $700,000 in cash and in the bank. The jury was also presented with evidence that Defendant lacked other sources of income and had substantial debts. Based on this evidence as a whole, the jury could have reasonably believed that Defendant's asset statement was an accurate account of his cash on hand.

The Court concludes that there is nothing in the Defendant's case that alters the sufficiency of the evidence to support the convictions for tax evasion. Accordingly, the Court shall deny Defendant's motion for a judgment of acquittal at the close of all of the evidence.

//

//

//

//

**CONCLUSION**

For the foregoing reasons, the Court finds that the evidence presented by the Government during its case at trial was proof beyond a reasonable doubt supporting Defendant's convictions on Counts 3 and 4 of the Indictment. The Court shall therefore DENY Defendant's motions for judgment of acquittal. An appropriate Order accompanies this Memorandum Opinion.

Date: December 22, 2009

**COLLEEN KOLLAR-KOTELLY**
United States District Judge