**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Criminal Action No. 09-087 (CKK) |
| ABDUL KARIM KHANU, | |
| Defendant. | |

**MEMORANDUM OPINION**
(December 22, 2009)

Before the Court is Defendant's [77] Motion for Reconsideration of Revocation of Bond

and Request for Expedited Hearing.  Following Defendant's conviction for two counts of tax

evasion, the Court granted the Government's oral motion to revoke Defendant's bond.

Defendant has filed an opening and reply brief in support of his motion for reconsideration, and

the Government has filed an opposition.[1]  Based on the entirety of the evidence in the record, the

parties' submissions, and the applicable law, the Court finds that Defendant has not shown by

clear and convincing evidence that he does not pose a risk of flight.  The Court shall therefore

DENY Defendant's Motion for Reconsideration.

**FACTUAL AND LEGAL BACKGROUND**

At Defendant's initial hearing, Chief Judge Royce C. Lamberth ordered that Defendant be

released on personal recognizance, subject to several conditions.  *See* [4] Order.  These

---

[1] On December 10 and 11, 2009, the Court also held two brief conference calls off the
record with counsel for both parties to discuss discrete issues raised in the parties' briefs.

conditions included reporting to the D.C. Pretrial Services Agency weekly by telephone, surrendering Defendant's passport, and surrendering the deed to the Property at 2014 Golden Morning Drive, Bowie, Maryland. Defendant remained released on personal recognizance without any violations subject to these conditions until his conviction.

Pursuant to 18 U.S.C. § 3143, a person who has been convicted of an offense must be detained pending sentencing unless the Court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . ." 18 U.S.C. § 3143(a)(1). Accordingly, the Defendant bears the burden of proving by clear and convincing evidence that he is neither a flight risk nor a danger to the community.

## DISCUSSION

At the post-conviction hearing, the Government asserted three reasons why it believed that Defendant was likely to flee: (1) Defendant is facing a mandatory deportation as a result of his conviction because he is a non-citizen; (2) Defendant's real estate assets have recently been sold; and (3) Defendant is and has been doing business with the Lux nightclub, which provides him access to large amounts of cash. In response, Defendant argued that he has extensive ties to the community, has lived in the area since he was six years old, has only a limited relationship with the Lux nightclub, and that his deportation to Sierra Leone is far from certain because of internal civil war ravaging that country. Defendant also proffered several conditions that would guarantee his appearance for sentencing, including GPS monitoring. The parties have elaborated upon their positions in their briefs, and the Court shall review each of the parties' arguments below.

### A.    Deportation to Sierra Leone

Defendant contends that his deportation to Sierra Leone is "not a foregone conclusion" because, on information and belief, Sierra Leone is not accepting individuals that are being deported from the United States as a result of the civil war in that country. Def.'s Mem. at 3-4. Therefore, he claims that the threat of deportation following completion of his sentence is not a strong factor in evaluating his flight risk.

Defendant's "belief" that Sierra Leone would not accept him is contradicted by his own behavior and by the evidence put forth by the Government in its opposition brief. As the Government points out, the State Department does not have any current travel warnings issued for Sierra Leone that would indicate long-term, protracted conditions that make a country dangerous or unstable. *See* Gov't's Mem. at 6 (citing U.S. Dep't of State, Travel Information: Current Travel Warnings, http://travel.state.gov/travel/cis_pa_tw/tw/tw_1764.html (last visited Dec. 7, 2009)). Indeed, Defendant admits in his reply brief that he himself visited Sierra Leone in February 2009. Def.'s Reply at 6. In addition, although the Department of Homeland Security ("DHS") once had halted deportations to Sierra Leone for safety reasons, DHS resumed deportations in 2004 because it determined that "there is no longer an ongoing armed conflict within Sierra Leone that would pose a serious threat to the personal safety of returning nationals of Sierra Leone." *See* Bureau of Citizenship and Immigration Services, Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation, 68 Fed. Reg. 52407, 52408 (Sept. 3, 2003). DHS noted in September 2003 that "the armed conflict that provided the basis for" restricting deportation to Sierra Leone "is over." *Id.* Accordingly, there is no basis for the Court to

conclude that Defendant's mandatory deportation will not actually occur. Defendant's claim that

he has hired an immigration attorney in an attempt to fight his deportation, Def.'s Reply at 5,

does not change the calculus because the Court cannot assume that Defendant will be successful

in any such challenge.[2]

The likelihood of Defendant's deportation is a significant factor supporting a finding that

Defendant is a flight risk. Defendant disputes this, arguing that the fact that he faces deportation

following completion of his sentence is not in itself evidence that he is a flight risk. *See* Def.'s

Reply at 5. However, the cases he cites in favor of this proposition all involve *pretrial* release, at

which stage defendants must be released unless a judicial officer finds that no conditions exist

that will "reasonably assure the appearance of the person." 18 U.S.C. § 3142(b). Now that

Defendant has been convicted, he bears the burden of showing by clear and convincing evidence

that he is not a flight risk. If Defendant will be unable to return to the community after he

completes his sentence, his current ties to the community (strong or otherwise) provide little

assurance that he will remain in the jurisdiction long enough to be sentenced.[3] Defendant's

desire to spend a few last months with his family before sentencing and deportation is the only

---

[2] Defendant has not provided this Court with a preview of any of the arguments he might make to challenge his deportation, and this Court is not in a position to anticipate what decision immigration officials might make. *See* 8 U.S.C. § 1252(a)(2)(C) ("[N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of committing a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title."). Defendant's conviction makes him a deportable alien, *see* 8 U.S.C. § 1227(a)(2)(A)(iii), and there are expedited procedures for the removal of criminal aliens, *see* 8 U.S.C. § 1228.

[3] The Court notes that Defendant, through counsel, indicated to the Court at the final pretrial hearing that his possible deportation was a significant factor that weighed against accepting the Government's plea offer. Accordingly, Defendant's desire to avoid deportation is not purely speculative on the part of the Government.

community connection that is material to determining his flight risk, and that must be balanced

against the possibility that Defendant will abscond to another country and be joined by his family

at some future date. The Government has pointed out—with no response by Defendant—that

many of the countries to which Defendant might flee, including Sierra Leone, do not have

extradition treaties that cover tax crimes. *See* Gov't Mem. at 7. Although Defendant has

surrendered his passport, it is not far-fetched to believe that a convicted felon facing prison time

and deportation would attempt to flee to a nearby safe haven such as Mexico.[4]

**B.      Sale of Property & Access to Cash**

Another critical factor that supports a finding that Defendant is a flight risk is his access

to significant amounts of cash. The Government argues that Defendant has obtained a large

source of cash from the recent sale of several properties, all in Potomac, Maryland: 9212

Harrington Drive (sold for $10 million on April 9, 2008); 9301 Harrington Drive (sold for

$2,825,000 on July 29, 2009); and 8880 Bradley Boulevard (sold for $1,585,000 on June 5,

2009). *See* Gov't Mem. at 8. Defendant contends that the sale of these properties did not result

in a large stockpile of cash. He claims that 9121 Harrington Drive was an investment property

with a mortgage of more than $5 million, resulting in a net gain upon sale of just over $4 million.

Def.'s Reply at 6. He claims that he used the proceeds from that sale to purchase 9301

Harrington Drive as an investment property for $3.2 million and invested the remaining proceeds

---

[4] The Government has represented to the Court, albeit without legal citation, that Mexico does not have an extradition treaty covering tax matters. *See* Gov't Mem. at 7. The Court notes that tax evasion is not among the crimes explicitly covered by the U.S.-Mexico Extradition Treaty, although it appears that such a crime might provide a basis for extradition if it is a crime in Mexico punishable by at least one year in prison. *See* Extradition Treaty, art. 2, ¶ 2, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059. Because Defendant has failed to respond to the Government's assertion that there are many possible jurisdictions to which Defendant may flee without fear of extradition, the Court assumes that this is in fact a realistic possibility.

into improvements to that property. *Id.* He contends that he ultimately sold that property for a loss at $2.8 million. *Id.* He also contends that the sale of 8880 Bradley Boulevard was subject to a $1 million line of credit, so he realized only about $500,000 from that sale. *Id.*[5] Defendant claims that the proceeds from these sales (which the Court calculates to be at least $3.3 million) went to financing his legal defense, with the remainder deposited into his bank account. *Id.* at 6-7.[6]

According to the Government, Defendant had a balance of over $2 million in his bank account as of December 4, 2009. Gov't Mem. at 8-9. Defendant does not dispute this assertion in his reply brief—rather, he uses this figure as support for the notion that his cash reserves will be adequate to satisfy back taxes owed to the IRS without resorting to foreclosure on the home at 2014 Golden Morning Drive in which Defendant now resides with his mother. *See* Def.'s Reply at 2-3. In addition, the Government contends that two cash withdrawals of $100,000 each were made during the month of November 2009. Gov't Mem. at 9. Defendant does not dispute this fact or attempt to explain the disposition of those funds in his Reply. Therefore, the Court can reasonably conclude that, at a minimum, Defendant has at least $2.2 million in cash at his disposal—more than enough money to finance a flight out of this jurisdiction.

---

[5] The Defendant has not provided the Court with any independent evidence to verify these figures, but the Court shall assume that they are correct for purposes of deciding the pending motion.

[6] The Court notes that Defendant's explanation as to how he spent the proceeds from these sales has not been consistent. In his opening brief, Defendant stated that "some of the proceeds were use[d] to purchase a home in Bowie, MD, and the Court has the deed to that home." Def.'s Mem. at 4. After the Government indicated in its brief that this could not be possible because the Bowie home was bought in 2007, *see* Gov't Mem. at 8, Defendant changed his explanation and said that the proceeds of the sales were used to pay legal bills and deposited into his bank account. Def.'s Reply at 6-7.

In addition, the Government notes that it was proved at trial that Defendant was a serial hoarder of cash. There was uncontroverted evidence at trial that Defendant had at least $700,000 in cash on hand in 1999 and that he was in possession of $1.9 million in cash in October 2003.[7] Defendant was convicted of tax evasion for having substantial amounts of cash not declared as income on his tax returns. Accordingly, the Court is wary of assuming that the amounts of cash that have been disclosed are the only sources of cash available to Defendant.

## C.    Involvement with Lux Lounge

Defendant's involvement with Lux Lounge is another reason to believe that Defendant has access to large amounts of cash. Defendant concedes that he has worked as a promoter at the Lux nightclub and was responsible for making substantial cash deposits of the proceeds in the corporate bank account of Arm LLC, the owner of Lux nightclub. Def.'s Mem. at 4. Defendant concedes that he has signatory power on some of Arm, LLC's bank accounts, although he contends that he is only able to sign with owner approval. Def.'s Reply at 8. Defendant asserts—without any evidentiary support—that he has only used this power to write minimal checks to cover promotional expenses at the owner's approval and that he has never made any withdrawals from the account. *Id.*

The Government asserts, also without factual support, that Department of Treasury records indicate that Defendant conducted 125 transactions totaling $4.7 million in 2008 and conducted 470 transactions totaling $9.4 million in 2007. Gov't Mem. at 10. Defendant disputes these facts, Def.'s Reply at 8, and there is not adequate evidence in the record to permit to Court

---

[7] Defendant's theory at trial that he was holding the $1.9 million in cash on behalf of the nightclubs he operated may or may not have been believed by the jury. However, it is the fact that Defendant had access to such a large amount of cash that it is relevant for purposes of determining his risk of flight, not whether the cash ultimately belonged to him.

to make a factual finding as to these disputed transactions. Therefore, the Court does not rely on these figures in determining whether Defendant poses a flight risk.[8]

The Court finds that Defendant's own admissions concerning his conduct with the Lux nightclub demonstrate a connection to large amounts of cash. Perhaps recognizing this, Defendant offers that he will terminate his connection with Lux as a condition of his release. Def.'s Mem. at 4-5. While severing Defendant from his duties at Lux may diminish his ability to access large amounts of cash going forward, it will have no effect on any cash that Defendant may have taken off the books while acting as a promoter there. Considering that Defendant was convicted by the jury for nearly identical conduct at his other nightclub ventures, it is likely that Defendant has been able to hoard cash from Lux that could be used to finance flight from the jurisdiction. Defendant has not controverted the Government's evidence that Defendant had the means for accumulating cash, and the Court must consider this as a factor in deciding whether Defendant is a flight risk.

## D.    Defendant's Proffered Conditions of Release

Defendant has proffered a number of conditions that he contends will ensure his appearance at sentencing. First, he proposes that the pretrial release conditions be continued. These included regular check-ins with Pretrial Services, surrender of his passport, and surrender of the deed to the property at 2014 Golden Morning Drive, where Defendant has lived with his mother. Defendant contends that he would not risk losing the deed to his family home by fleeing

---

[8] The Government contends that Defendant has shown a "lack of candor" to the Court regarding his involvement with Lux nightclub. Gov't Mem. at 10. However, because Defendant disputes the very allegations the Government believes demonstrate his lack of candor, the Court does not accept the Government's invitation to discredit Defendant's explanations of his conduct. Nevertheless, the Court retains a healthy degree of skepticism regarding Defendant's promised intentions.

the jurisdiction. Def.'s Mem. at 4. However, the Court is not convinced that Defendant's family would be thrown onto the streets if Defendant were to flee and the Court took possession of the deed to the residence. Defendant has conceded that he has enough resources (over $2 million in his bank account) to ensure that his family does not go homeless in such circumstances.

Defendant has also offered to surrender the deeds to two other properties in which his relatives currently reside. Def.'s Mem. at 5. As an initial matter, the Court notes that it has no information regarding the value of these properties or how much equity is in them. Accordingly, the Court cannot evaluate what financial risk Defendant would be taking by surrendering these deeds to the Court if he subsequently flees. And as with the home in which Defendant is currently residing with his immediate family, the Court is not convinced that Defendant could not arrange alternative housing options for his family if he does flee.

The Government has claimed, and Defendant is willing to assume for purposes of this motion, that the tax loss to the Government from Defendant's conduct is approximately $1 million, exclusive of interest and penalties. *See* Def.'s Mem. at 3 n.1. In addition to the property at 2014 Golden Morning Drive, Defendant has offered to post a cash bond of $500,000. *Id.* at 3. Defendant contends that the combined value of these assets is approximately $1 million, enough to satisfy the tax loss to the Government and provide additional assurance that Defendant will not flee the jurisdiction. *Id.* Even assuming Defendant's valuation is correct,[9] though, Defendant's offer to provide assets sufficient to meet his tax liabilities misses the mark. Because this is a criminal proceeding rather than a civil tax matter, the Court's primary concern is ensuring that

---

[9] The Government contends that although Defendant purchased 2014 Golden Morning Drive in 2007 for $490,000, the current assessed value of the home is $338,000. Gov't Mem. at 8. Defendant does not dispute this assertion.

the pledged assets are sufficient to guarantee Defendant's appearance at sentencing, not to guarantee that the assets will be enough to pay off his back taxes. The fact that Defendant has agreed to surrender property approximately equal in value to what he would otherwise be forced to surrender through civil tax remedies is not compelling evidence that Defendant has an incentive not to flee. This is particularly so in light of the evidence that Defendant has at least $2 million in the bank and may have significant other cash resources that are untraceable.

The Government has also pointed out that the 2014 Golden Morning Drive property at which Defendant has been residing with his family is actually owned by the "Abdul Karim Khanu Revocable Trust" and that the IRS will likely seize that property in order to satisfy Defendant's tax liabilities. Although Defendant states that he would contest any such seizure, the fact that the house is possibly subject to seizure significantly undermines its value as security for Defendant's appearance at sentencing. Additionally, the Court has no information regarding how much equity is in the home.

Finally, Defendant offers to wear a GPS tracking device at all times and be placed in a "high intensity home confinement program" in which he will be confined to his home 24 hours per day, 7 days per week. *See* Def.'s Reply at 1-2.[10] The Government contends that electronic monitoring is insufficient to guarantee Defendant's appearance because it simply gives authorities notice that a defendant has fled and does not help them locate and recapture him. *See* Gov't Mem. at 4-5. The Court agrees. "[I]t is well settled that electronic monitoring, use of GPS device and home detention do not guarantee against flight." *United States v. Bergrin*, Crim. No. 09-369, 2009 WL 1560039, at *10 (D.N.J. May 29, 2009). "The GPS system, while

---

[10] Defendant has also proffered to the Court that Pretrial Services has accepted him for a home confinement program. *See* Def.'s Supp. Mem. at 1-2.

technologically sophisticated, is ultimately just another form of electronic surveillance, and 'monitoring equipment is easily rendered inoperative or becomes so by mechanical failure.'" *United States v. Benatar*, No. 02-CR-99, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (quoting *United States v. Gotti*, 776 F. Supp. 666, 673 (E.D.N.Y. 1991)). The GPS system of surveillance is imperfect, and even attentive monitoring leaves the possibility of several hours' delay between a defendant's departure and the beginning of an effective search. *See United States v. Megahed*, 519 F. Supp. 2d 1236, 1244 (M.D. Fla. 2007) (describing the inadequacy of GPS monitoring). Thus, Defendant's offer of participation in a home confinement program is not adequate to ensure that he will not flee.

## CONCLUSION

The Court finds that Defendant has not proved by clear and convincing evidence that he is not likely to flee if released under the conditions that he has proposed to the Court. Defendant faces mandatory deportation at the end of his sentence to a country which he has visited within the last year. By his own admission and by logical inference from the evidence before the Court, Defendant has access to substantial cash assets that could be used to finance a flight out of the jurisdiction. The proposed cash bond and assets pledged by Defendant do not provide a reasonable guarantee that he will appear for sentencing because the value of those assets does not clearly exceed the amount that Defendant is likely to owe the IRS in back taxes, interest, and penalties.

It is true that Defendant has not previously attempted to flee. But Defendant's failure to flee prior to his conviction does not, by itself, constitute clear and convincing evidence that he is unlikely to flee in the future. *See United States v. Ayllon*, 983 F.2d 298, 1993 WL 2747, at *1 (D.C. Cir. 1993) (Table). Although Defendant does have family and community ties to the area,

11

the fact that he will be deported following his sentence significantly undermines the strength of this factor in supporting release pending sentencing. Defendant's proposed conditions of release, although restrictive of Defendant's liberty, do not eliminate the risk of flight.

The Court also notes that Defendant filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Because the Court has denied Defendant's Rule 29 motion, Defendant's motion does not provide additional grounds for release pending sentencing.

For the foregoing reasons, the Court shall DENY Defendant's motion for reconsideration of revocation of bond. Defendant's request for a hearing on this motion is also DENIED. An appropriate Order accompanies this Memorandum Opinion.

Date: December 22, 2009

**COLLEEN KOLLAR-KOTELLY**
United States District Judge